RICHARD R. BEST
REGIONAL DIRECTOR
Sanjay Wadhwa
Michael D. Paley
Judith A. Weinstock
Paul G. Gizzi
Kristine Zaleskas
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
212-336-0077 (Gizzi)
Email: gizzip@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> -against- <br><br> MARLON MULLER, <br><br> Defendant. | COMPLAINT <br><br> 21 Civ. _____ (    ) <br><br><br> JURY TRIAL DEMANDED |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Marlon Muller ("Defendant" or "Muller"), alleges as follows:

## SUMMARY

1.      This action concerns Muller's participation in a fraudulent scheme to manipulate the market for the stock of microcap issuer EMS Find, Inc. ("EMSF"). Beginning in approximately June 2015, Muller and an associate ("Associate") engaged in a pattern of coordinated trading intended to artificially raise and sustain EMSF's share price and to generate liquidity.

2.      Muller, using an internet chat application, instructed Associate when and how to submit buy and sell orders for EMSF shares, through several accounts controlled by Associate at multiple broker-dealers. Muller's purpose in giving Associate such instructions was to achieve certain price and liquidity levels for EMSF. This manipulative trading activity distorted the true value of EMSF shares as well as the actual market interest in EMSF, and operated as a fraud on the investing public. By engaging in this manipulative activity, Muller and Associate intended to make EMSF stock attractive to potential purchasers, enabling Associate to profitably unload his shares.

3.      During the period from June 2015 until September 2015, Muller received at least $65,000 from Associate in compensation for his role in this scheme, and at least another $265,000 from an entity that knowingly purchased EMSF shares from Muller and Associate during the scheme.

4.      During the same period, at least 1,500 retail accounts, including over 300 individual retirement accounts, invested over $1 million in EMSF stock. In the fall of 2015, after Muller and Associate stopped manipulating EMSF's share price and trading volume, EMSF's share price decreased, and those investors who still held EMSF stock lost value.

## **VIOLATIONS**

5.      By virtue of the foregoing conduct and as alleged further herein, Defendant: (a) has violated Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1) and (3)], and Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78i(a)(2) and 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(s) and (c)]; and (b) has aided and abetted violations by Associate of Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §§ 77q(a)(1) and (3)] and Exchange Act

Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §§ 240.10b-5(a) and (c)].

6.       Unless Defendant is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7.       The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

8.       The Commission seeks a final judgment: (a) permanently enjoining Defendant from violating the federal securities laws this Complaint alleges he has violated; (b) permanently enjoining Defendant from, directly or indirectly, engaging in any activity for the purpose of inducing or attempting to induce the purchase or sale of any security; causing any person or entity to engage in any activity for the purpose of inducing or attempting to induce the purchase or sale of any security; or deriving compensation from any activity engaged in for the purpose of inducing or attempting to induce the purchase or sale of any security; unless that security is: (i) listed on a national securities exchange, and (ii) has had a market capitalization of at least $50,000,000 for 90 consecutive days; (c) ordering Defendant to disgorge all ill-gotten gains and/or unjust enrichment received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)]; (c) ordering Defendant to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (e) permanently prohibiting Defendant from participating in any

offering of a penny stock, pursuant to Securities Act Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and (f) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

10.      Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

11.      Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Defendant may be found in, is an inhabitant of, or transacts business in the Southern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. For example, some of the investors who purchased EMSF stock during Defendant's stock manipulation resided in this District, and Associate traded EMSF stock that he had deposited in a broker-dealer located in this District.

## DEFENDANT[1]

12.      **Muller**, age 45, resides in Middleburg, Virginia. In August 2014, Muller and others were sued in Palm Beach County, Florida by the owners of a microcap issuer, who alleged that the defendants had promised to promote the issuer in exchange for stock, but failed to promote the issuer yet retained the stock. *Summit Trading Limited, et al. v. George Lambro,*

---

[1]      Muller entered into three separate tolling agreements with the Commission that collectively tolled and suspended the running of any applicable statute of limitations from January 27, 2020 through July 27, 2021.

*Marlon Muller, et al.*, 2014CA010128.   Muller has never been registered with the Commission or been associated with a registered entity.

## RELEVANT ENTITY

13.     **EMSF** was, at all relevant times, a Nevada corporation headquartered outside Philadelphia, Pennsylvania.  It was quoted on OTC Link (previously "Pink Sheets") operated by OTC Markets Group Inc. under the ticker symbol "EMSF," and purported to be developing a mobile application to connect health care professionals and patients with medical transport.  On June 19, 2017, EMSF changed its name to Integrated Ventures Inc.  The company continues to be quoted on OTC Link, now under ticker symbol "INTV," and currently purports to be a diversified holding company in the technological sector with a focus on cryptocurrency.

## FACTS

### THE EMSF STOCK MANIPULATION SCHEME

14.     Beginning around June 2015, Muller and Associate agreed to manipulate the trading in EMSF securities.  At the time, Associate sought to liquidate a large position in EMSF shares.  The goal of the scheme was to artificially raise and sustain EMSF's share price and to generate liquidity, through manipulative trading and promotional activity.  By doing so, Muller and Associate intended to make EMSF stock attractive to potential purchasers, enabling Associate to profitably unload his shares.

15.     During the scheme, Muller and Associate communicated via internet chat, almost always throughout the entire trading day.  Muller and Associate discussed trading strategies, with Muller often instructing Associate specifically how many EMSF shares to buy or sell, the price at which to buy or sell, and, at times, the trading platform or broker-dealer to use.

16.     Associate followed Muller's instructions.

17.     Muller and Associate referred to one of their manipulation methods as "peppering" the market or "running at an offer," *i.e.,* placing buy orders of small quantities at the lowest offering price to create the appearance in the market of significant trading activity and to prevent EMSF's share price from falling.  Muller and Associate used several brokerage accounts to "pepper the market" for EMSF shares.

18.     Muller and Associate also employed another manipulation method they referred to as "showing support to the market," *i.e.*, placing bids for large quantities of EMSF shares at prices slightly below the highest bid.  This was done to prevent the share price of EMSF from falling.  Muller and Associate wanted EMSF's closing price for a trading day to exceed its opening price, which they referred to as closing "in the green."  To close in the green, Muller and Associate engaged in a manipulative activity generally known as "marking the close," whereby they executed trades at or near the close of the market for the purpose of artificially inflating the end-of-day share price of EMSF stock.

19.     From at least June 26 through July 21, 2015 ("the Initial Manipulation Phase"), Muller and Associate managed to close "in the green" on more than 25% of the trading days.

20.     Every trading day during this period, Muller and Associate discussed via online chats their strategies to raise or maintain EMSF's price.  Muller regularly directed Associate when to bid for or buy EMSF, and directed Associate how many shares and at what price to bid for or buy EMSF.

21.     For example, on July 1, 2015, EMSF's opening price was $1.14 per share.  As the price dipped to $1.06 in mid-morning, Associate asked Muller via chat, "what do you think you should do?"  After some back-and-forth, Muller responded with directions to use an online trading platform for "running at the offer."  Associate thereafter "peppered" the market,

engaging in nineteen market purchases in less than three minutes that resulted in EMSF's price rising to $1.16.  Throughout the rest of the day, Muller and Associate continued to chat online, with Muller instructing Associate at which price to buy and sell EMSF.

22.     Buy orders placed by Associate resulted in the execution of at least 140 buys throughout the day.  EMSF's share price closed at $1.20 that day.

23.     On July 7, 2015, EMSF's stock opened at $1.17 per share, but quickly declined to $1.12 per share.  Beginning at about 10:18 a.m., buy orders placed by Associate resulted in the execution of 18 buys of EMSF shares over an 18-minute period, until the share price had increased back to $1.17 per share.  Throughout the day, Associate made additional buys of EMSF stock to prevent the share price from declining.   In the late afternoon, Associate asked Muller via chat, "how should we handle the end of the day so it closes positive?"  Muller replied, "towards the last 30 minutes we [start] to [lift]."

24.     Associate's buy order resulted in the second-to-last trade of the day, which raised the closing price to $1.23 per share that day.

25.     On July 14, 2015, EMSF opened at $1.09 per share, but by 10:23 a.m., the price had fallen to $1.04.  Over the next 24 minutes, buy orders placed by Associate resulted in the execution of at least 160 purchases of EMSF shares totaling 40,651 shares, increasing the price to $1.11 per share.  Later that morning, Muller instructed Associate, "I would run at it and lift price to $1.15."  Ten minutes later, Associate purchased 2,600 shares of EMSF at $1.14, and continued to make purchases throughout the day at prices between $1.13 and $1.15 per share.

26.     EMSF's share price closed at $1.15 that day.

27.     On July 17, 2015, EMSF's price opened at $1.15 per share.  By 10:39 a.m., its price had fallen to $1.10.  Associate made his first buy at $1.12 per share, but the price continued

to fall, hitting $1.03 per share. Associate asked Muller, "what you think . . . , pepper?" Muller replied "yes" and instructed Associate to place bids using an account at a particular broker-dealer. Associate made multiple purchases in the next three minutes to increase the price back to $1.12 per share, as Muller continued texting instructions. During the rest of the day, Muller continued to direct Associate's activities: "ok you have to pepper"; "remember always bid first"; "go ahead and lift back to 1.14"; and "actually lift to 1.16 so it shows green." Associate followed Muller's instructions, placing buy orders resulting in numerous purchases at prices ranging from $1.12 to $1.17 per share.

28.     Associate's buy order resulted in last buy of the day at $1.17 per share, resulting in the stock ending "in the green" that day.

29.     On July 20, 2015, Muller and Associate expressed to each other their mutual concern that the EMSF share price would decline significantly and that they might "get pummld." Muller instructed Associate to use a specific account to buy EMSF at $1.16 per share and to "strt the day peppering." Associate carried out Muller's instruction. At 3:24 p.m., as the end of the trading day approached, Muller instructed Associate to "lift" the price to "1.17." Within the next two minutes, Associate made five buys of EMSF shares at $1.17 per share. Later in the afternoon, Muller instructed Associate, "lets close it at 1.20 so sell some if you have to." Associate again carried out Muller's instruction.

30.     EMSF stock closed at $1.20 per share that day.

31.     During the period June 26 through July 21, 2015, accounts controlled by Associate bought approximately one million shares of EMSF, accounting for approximately 40% of EMSF's trading volume.

32.     During the period from June 2015 until September 2015, Associate wired Muller

a total of $65,000 from an offshore account, as compensation for Muller's assistance in manipulating the share price and trading volume of EMSF.

33.     During the period from June 2015 until September 2015, Muller also received at least another $265,000 from an entity that knowingly bought EMSF shares from Muller and Associate while Muller and Associate were manipulating the price and volume of trading.

34.     From June 2015 through September 2015, at least 1,500 retail accounts, including more than 300 individual retirement accounts, invested over $1 million in shares of EMSF.

35.     In the fall of 2015, after Muller and Associate stopped manipulating EMSF's share price and trading volume, EMSF's price decreased, and those investors who still held EMSF stock lost value.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Sections 17(a)(1) and (3)

36.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 35.

37.     Defendant, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, and/or (2) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

38.     By reason of the foregoing, Defendant, directly or indirectly, has violated and, unless enjoined, will again violate Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §§ 77q(a)(1) and (3)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and (c) Thereunder

39.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 35.

40.     Defendant, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, and/or (ii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

41.     By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

## THIRD CLAIM FOR RELIEF
### Violations of Exchange Act Section 9(a)(2)

42.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 35.

43.     Defendant, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, effected, alone or with one or more other persons, a series of transactions in a security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

44.     By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 9(a)(2) [15 U.S.C.

§ 78i(a)(2)].

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Sections 17(a)(1) and (3)

45.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 35.

46.     As alleged herein, Associate violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §§ 77q(a)(1) and (3)].

47.     Defendant knowingly or recklessly provided substantial assistance to Associate with respect to his violations of Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §§ 77q(a)(1) and (3)].

48.     By reason of the foregoing, Defendant is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting Associate's violations of Securities Act Section 17(a)(1) and (3) [U.S.C. §§ 77q(a)(1) and (3)] and, unless enjoined, Muller will again aid and abet these violations.

## FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and (c)

49.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 35.

50.     As alleged above, Associate violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

51.     Defendant knowingly or recklessly provided substantial assistance to Associate with respect to his violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

52.     By reason of the foregoing, Defendant is liable pursuant to Exchange Act Section

20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Associate's violations of Exchange Act Section

10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and

(c)] and, unless enjoined, Defendant will again aid and abet these violations

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final

Judgment:

### I.

Permanently enjoining Defendant and his agents, servants, employees and attorneys and

all persons in active concert or participation with any of them from violating, directly or

indirectly, Securities Act Sections 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1) and (3)], and

Securities Act Sections 9(a)(2) and 10(b) [15 U.S.C. §§ 78i(a)(2) and 78j(b)] and Rules 10b-5(a)

and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)];

### II.

Permanently enjoining Defendant from directly or indirectly: engaging in any activity for

the purpose of inducing or attempting to induce the purchase or sale of any security; causing any

person or entity to engage in any activity for the purpose of inducing or attempting to induce the

purchase or sale of any security; or deriving compensation from any activity engaged in for the

purpose of inducing or attempting to induce the purchase or sale of any security; unless that

security is: (i) listed on a national securities exchange; and (ii) has had a market capitalization of at

least $50,000,000 for 90 consecutive days;

### III.

Ordering Defendant to disgorge all ill-gotten gains and/or unjust enrichment received

directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations,

pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and

78u(d)(7)];

## IV.

Ordering Defendant to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

## V.

Permanently prohibiting Defendant from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, under Securities Act Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and

## VI.

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this

case be tried to a jury.


Dated: New York, New York
      July 14, 2021

*Richard R. Best*  _____
RICHARD R. BEST
REGIONAL DIRECTOR
Sanjay Wadhwa
Michael D. Paley
Judith A. Weinstock
Paul G. Gizzi
Kristine Zaleskas
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
212-336-0077 (Gizzi)
Email: gizzip@sec.gov